**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| ONEITA STEELE, | ) |
| | ) |
|      Appellant, | ) |
| | ) |
| v. | )     CIVIL ACTION 12-0707-WS-C |
| | ) |
| DWAYNE LAROY HEARD, | ) |
| | ) |
|      Appellee. | ) |

**ORDER**

This matter comes before the Court on plaintiff/appellant Oneita Steele's Notice of
Appeal (doc. 1) pursuant to 28 U.S.C. § 158(a).  Steele seeks review of the Bankruptcy Court's
determination that her claim for payment of certain benefits from defendant/appellee Dwayne
Laroy Heard's pension plan is a debt dischargeable upon completion of Heard's Chapter 13 plan.
The appealed-from ruling was manifested in a judgment on August 9, 2012, as memorialized by
minute entry on August 10, 2012, and in the ensuing denial of Steele's motion to alter, amend or
vacate on August 27, 2012.  The appellate briefing process having concluded, this appeal is now
ripe for disposition.[1]

**I.    Bankruptcy Court Proceedings and Rulings from which Appeal is Taken.**

    ***A.    The Adversary Proceeding.***

Defendant/appellee Dwayne Laroy Heard commenced Chapter 13 bankruptcy
proceedings in the United States Bankruptcy Court for the Southern District of Alabama on or
about April 27, 2012.  On or about July 13, 2012, plaintiff/appellant Oneita Steele filed an
Adversary Proceeding against Heard.  In her filing, Steele claimed a right and entitlement to

---

[1]    Appellant has requested oral argument.  Pursuant to the Local Rules, "the court
may in its discretion rule on any motion without oral argument."  LR 7.3.  Upon careful review
of the parties' briefs, and in light of the narrow legal issues presented on appeal, the Court is of
the opinion that oral argument is unlikely to be beneficial in resolving such issues.  Accordingly,
the request for oral argument is **denied**.

certain pension benefits and distributions accruing to Heard, based on a divorce order requiring Heard to pay over those benefits to her. By contrast, Heard maintained in his bankruptcy schedules that those pension benefits were his property. As framed by the parties and the Bankruptcy Court at the ensuing hearing, the central issues raised in the Adversary Proceeding were (i) whether the subject pension benefits claimed by Steele were in the nature of a property settlement or support, and (ii) whether such benefits were part of Heard's bankruptcy estate (which could then be used to fund Heard's Chapter 13 plan), or outside the bankruptcy estate (*i.e.*, the sole and separate property of Steele).

The material facts are largely undisputed on appeal. (*See* doc. 9, at 10-13; doc. 11, at 4.) In summary, Steele and Heard were married in Illinois in 1983, and divorced in the same state in 1994. At the time of their dissolution, Heard was employed by the City of Chicago's Department of Streets and Sanitation, and was a member of its pension plan (known by the acronym "LABF"). The Judgment for Dissolution of Marriage entered by an Illinois court in September 1994 approved Steele's and Heard's "oral property settlement agreement." (*See* doc. 1, Exh. D.)[2] In relevant part, that agreement (as reflected by and incorporated in the September 1994 Judgment) provided that Steele "shall participate in each of the payments received by [Heard] as and for his retirement or pension" utilizing a specified formula. (*Id.*, ¶ G(9).)[3] If and when Heard received any payment of pension benefits, he was to apply that formula "to determine[] and immediately pay to [Steele] the sum equal to" the computed amount. (*Id.*) As adopted in the Judgment, the property settlement agreement further stated that "[t]his benefit shall be enforceable by garnishment of [Heard] by [Steele]. In the event municipal pensions

---

[2]     Specifically, the Judgment indicated that "[t]he parties have entered into an oral property settlement agreement concerning the questions of maintenance of the parties and the respective rights of each party in and to the property, income or estate which either of them now owns or may hereinafter acquire, including a division of all marital and non-marital property …. Such oral agreement was entered into freely and voluntarily between the parties and is not unconscionable and outht [*sic*] to receive the approval of this Court." (*Id.*, ¶ G.)

[3]     The Judgment documented that formula as follows: (i) calculation of a fraction, the numerator of which was the number of months of the Steele/Heard marriage during which Heard earned benefits, and the denominator of which was the total number of months in which Heard earned benefits; (ii) multiplication of that fraction by 50%; and (iii) multiplication of the resulting number by the amount of each payment received by Heard to compute the amount due and immediately owing to Steele.

become subject to a Qualified Domestic Relations Order (QDRO), [Steele] shall have the right to make application directly to the proper pension board or boards." (*Id.*)

Heard began receiving monthly LABF pension benefits in July 2006; however, he made no payments to Steele in accordance with the terms of the September 1994 Judgment. (Doc. 9, at 11, 13.) More than five years after Heard began receiving these benefits, on November 15, 2011, Steele (who resides in Westmont, Illinois) filed a petition in Illinois state court seeking, among other things, entry of a Qualified Illinois Domestic Relations Order ("QILDRO") under Illinois law, dividing Heard's governmental pension benefits pursuant to the divorce decree. (Doc. 1, Exh. E.) Essentially, Steele sought an order from the Illinois court that forced Heard to pay her the agreed-upon pension benefits, and/or afforded Steele the ability to obtain payment directly from the LABF. Although Steele couched her petition in "emergency" rhetoric, the Illinois court apparently made no ruling during the next five months. In April 2012 (without the Illinois court having decided Steele's petition), Heard (who now resides in Marion, Alabama) filed his Chapter 13 petition in this district, listing Steele as an unsecured creditor. This Adversary Proceeding followed.

### B.   *The August 9 Hearing and the Bankruptcy Court's Ruling.*

Upon the filing of Steele's adversary proceeding, U.S. Bankruptcy Judge Mahoney set the matter for hearing on August 9, 2012. (*See* doc. 2.) At that time, the parties stipulated that the challenged benefits are "not subject to a Qualified Domestic Relations [O]rder under ERISA" and that they presently are not (but may become) subject to a QILDRO. (Doc. 2, at 14-15.)[4] As the hearing progressed, the Bankruptcy Court received exhibits and heard live testimony from both Steele and Heard.[5] Steele testified that the parties had agreed at the time of divorce that she would "accept a portion of the pension" in lieu of alimony. (Doc. 2, at 26.) Steele explained

---

[4]     The ERISA stipulation was a formality. After all, it is well-settled that Qualified Domestic Relations Orders (a creature of ERISA) have no application to governmental plans. *See, e.g.*, 29 U.S.C. § 1003(b)(1) (exempting governmental plans from ERISA's scope); *Krafick v. Krafick*, 663 A.2d 365, 367 n.4 (Conn. 1995) ("the procedures set forth in the United States Code for a QDRO do not apply to a governmental pension plan").

[5]     Neither counsel nor parties were physically present in the courtroom; however, all participants utilized video and/or telephonic connections in a manner that afforded them a full and fair opportunity to present evidence and make arguments.

that, with respect to the pension benefits that Heard owed her, she "was just under the assumption that they would automatically start, once he did retire." (*Id.* at 28.)  And Steele conceded that she is not claiming that Heard owed her alimony, maintenance or support since the time of the divorce.  (*Id.* at 42.)  For his part, Heard testified that he did not understand at the time that he was required to make pension payments to Steele pursuant to the September 1994 Judgment, but that he instead thought that such payments "would automatically go to her" and that it would be "automatically done after we were divorced." (*Id.* at 57-58.)  As Heard put it, "I really didn't understand any of this." (*Id.* at 59.)

Specifically with regard to the QILDRO issue, Heard testified that he had not consented and would not consent to the issuance of a QILDRO.  (*Id.* at 86.)  Heard also read certain QILDRO information into the record from an exhibit purportedly from the Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("LABF"), and listing an effective date of July 1, 2006. (Doc. 1, Exh. D-3.)[6]  In particular, Heard read, "If LABF membership started before July 1st, 1999, … a QILDRO will only be valid if the member signs a consent … to [issuance] of QILDRO, consent in writing. … [Y]ou must use the specific consent forms obtained from our office …." (Doc. 2, at 94.)[7]  Heard began working for the City of Chicago, and became a LABF member, in 1976.  (*Id.* at 62.)

Following this testimony, counsel for both sides were given an opportunity to argue their respective positions.  Steele's attorney maintained that "the pension distribution under the dissolution of the marriage created an interest in Ms. Steele as of the time that that decree was entered." (Doc. 2, at 96.)  According to Steele, once that September 1994 Judgment was entered,

---

[6]     That document explained that a QILDRO "is a court order issued by an Illinois court that directs an Illinois public retirement system to pay an alternate payee, all or a portion of a member's retirement benefit ….  An alternate payee is typically a former spouse ….  Illinois public funds may only pay benefits to a former spouse according to a QILDRO.  They cannot pay a former spouse based on a member's judgment for dissolution of marriage or marital settlement agreement." (Doc. 1, Exh. D-3, at 5.)

[7]     This statement conforms with applicable Illinois law.  *See* 40 Ill. Comp. Stat. 5/1-119(m)(1)("a QILDRO issued against a member of a retirement system established under an Article of this Code that exempts the payment of benefits or refunds from attachment, garnishment, judgment or other legal process shall not be effective without the written consent of the member if the member began participating in the retirement system on or before [July 1, 1999]").

Heard held those pension benefits for her "in a constructive trust" and "that benefit was no longer his to deal with." (*Id.*) Because the benefit was no longer his, Steele reasoned, "it's not a debt of Mr. Heard's, and with it not being a debt of his, it can't be discharged." (*Id.* at 97.) The crux of Steele's argument was her contention that, even if the pension benefit was deemed to be part of a property settlement, "it still should be found to have vested in her when that decree was signed. And with it not being a debt, it could not be bankrupted." (*Id.* at 100-01.)

Ruling from the bench, Judge Mahoney rejected Steele's contentions. Her oral decision recited the largely uncontested facts, and adjudicated the disputed legal issues as follows: (i) pursuant to the September 1994 Judgment, the pension benefits remained property of Heard's estate because the decree provided that Heard has the obligation to pay the funds over to her, such that "what he owes Ms. Steele is a debt;" (ii) there is no QDRO here, because the parties so stipulated; (iii) there is no QILDRO here, because Heard has not consented to issuance of a QILDRO; (iv) from the plain language of the divorce order, the agreed pension arrangement "is a property settlement;" (v) no constructive trust was formed; and (vi) under the language of the divorce order, "it can't be her property because … it says it had to come through Mr. Heard," which "clearly shows it's not self-executing and it was not in her hands." (Doc. 2, at 117-19.) On that basis, the Bankruptcy Court declared "the debt to be a dischargeable property settlement debt in the case." (*Id.* at 122.)[8]

## II.   Analysis.

### A.   Standard of Review.

It is well established that "the district court in reviewing the decision of a bankruptcy court functions as an appellate court." *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). In that regard, "[t]he district court makes no independent factual findings," but instead reviews "the bankruptcy court's factual determinations under the 'clearly erroneous' standard." *Id.* "Factual findings are not clearly erroneous unless we are left with the definite and firm conviction that the court erred." *In re Walker*, 515 F.3d 1204, 1212 (11th Cir. 2008) (citation and internal quotation marks omitted); *see also In re Thomas*, 883 F.2d 991, 994 (11th

---

[8]     Following that August 9, 2012 ruling, Steele filed a Motion to Alter, Amend or Vacate Findings of Fact and Judgment on August 23, 2012. Four days later, the Bankruptcy Court entered a written order denying such motion and incorporating by reference the findings of fact and conclusions of law set forth in the record at the August 9 hearing.

Cir. 1989) ("clearly erroneous" standard applies to bankruptcy court's findings of fact, whether based on oral or documentary evidence, and "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses").  By contrast, the Bankruptcy Court's conclusions of law are subject to *de novo* review.  *See, e.g., In re Tennyson*, 611 F.3d 873, 875 (11th Cir. 2010) ("Conclusions of law reached by a bankruptcy court … are reviewed *de novo*.") (citation and internal quotation marks omitted).  In sum, then, the Bankruptcy Court's "[l]egal conclusions … are reviewed *de novo* and findings of fact are reviewed for clear error."  *In re Celotex Corp.*, 613 F.3d 1318, 1322 (11th Cir. 2010); *see also In re Cox*, 493 F.3d 1336, 1340 n.9 (11th Cir. 2007) ("Like the district court, we review the bankruptcy court's findings of fact for clear error and the court's conclusions of law and mixed questions of law and fact *de novo*.").

> **B.**      ***Is the Pension Settlement Dischargeable in Bankruptcy?***

The first issue the parties presented to the Bankruptcy Court was whether the pension benefit settlement (the "Pension Settlement") set forth in Paragraph G(9) of the September 1994 Judgment was in the nature of a property settlement, or whether it was in the nature of alimony, support or maintenance.  At the conclusion of the August 9 hearing, the Bankruptcy Court held that "it is a property settlement."  (Doc. 2, at 119.)

The distinction matters because, in the Chapter 13 context, spousal claims for alimony, maintenance or support are not dischargeable, whereas property settlements are.  Generally speaking, the Bankruptcy Code provides that debts are not dischargeable if they are "for a domestic support obligation," 11 U.S.C. § 523(a)(5), or if they are owed "to a … former spouse … of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor … in connection with a … divorce decree."  11 U.S.C. § 523(a)(15).  "Domestic support obligation" is a defined term meaning a debt owed to a former spouse that is "in the nature of alimony, maintenance or support" of the former spouse "without regard to whether such debt is expressly so designated."  11 U.S.C. § 101(14A)(B).  So § 523(a) provides that both alimony/ maintenance/ support debts (hereafter, "DSOs") and spousal debts other than DSOs (such as property settlements) are non-dischargeable.  In the Chapter 13 context, DSOs remain non-dischargeable.  *See, e.g., In re Benson*, 2011 WL 4435560, *1 (11th Cir. Sept. 26, 2011) ("In a Chapter 13 bankruptcy, a debtor can discharge most of his debts after he completes his bankruptcy plan payments. … But among the debts that cannot be discharged are domestic support obligations.").  However, spousal divorce obligations other than DSOs are dischargeable

in Chapter 13 cases because 11 U.S.C. § 1328(a)(2) incorporates § 523(a)(5), but not § 523(a)(15).  Overwhelming case law supports this statutory construction.[9]

Precedents from this Circuit instruct that the question of "[w]hether a given debt is in the nature of support is an issue of federal law. … In conducting this inquiry, a court cannot rely solely on the label used by the parties. … A debt is in the nature of support or alimony if at the time of its creation the parties intended the obligation to function as support or alimony." *Cummings v. Cummings*, 244 F.3d 1263, 1265 (11th Cir. 2001); *see also Benson*, 2011 WL 4435560, at *1 ("a debt is a domestic support obligation if the parties intended it to function as support or alimony"); *In re Santry*, 481 B.R. 824, 829 (Bankr. N.D. Ga. 2012) ("In making this determination, the intentions of the divorce court or, if a settlement, the parties when the obligation was created are of primary importance."); *In re Inman*, 2012 WL 2374419, *16 (Bankr. S.D. Fla. June 22, 2012) ("[T]he touchstone for dischargeability under § 523(a)(5) is the intent of the parties.") (citation omitted).  "[T]he party seeking to hold the debt nondischargeable has the burden of proving by a preponderance of the evidence that the parties intended the obligation as support."  *Cummings*, 244 F.3d at 1265 (citation omitted).  For purposes of this inquiry, "[a]] evidence, direct or circumstantial, which tends to illuminate the parties['] subjective intent is relevant."  *Id.* at 1266 (citation omitted).

---

[9]     *See, e.g., In re Pylant*, 467 B.R. 246, 251 (Bankr. M.D. Ga. Mar. 14, 2012) ("Obligations incurred by the Chapter 13 debtor in connection with a divorce which are not domestic support obligations under 11 U.S.C. § 101(14A) are covered by 11 U.S.C. § 523(a)(15).  Those types of obligations are generally referred to as being in the nature of property division and are dischargeable."); *In re Shultz*, 2012 WL 5879129, *2 (Bankr. D. Neb. Nov. 21, 2012) (in Chapter 13 context, debt that "is part of the parties' property settlement … is dischargeable if the debtor completes the payments under the terms of her confirmed plan"); *In re Hutchens*, 480 B.R. 374, 385-86 (Bankr. M.D. Fla. Oct. 4, 2012) ("A property settlement or division incurred in the course of a divorce does not fall under the new definition of a domestic support obligation. … Moreover, the law is now well-settled that a claim for a property settlement arising from divorce proceedings can still be discharged in a Chapter 13 case if a debtor makes all the required payments under a plan and receives a full compliance discharge under § 1328(a)."); *In re Wood*, 2012 WL 14270, *1 (Bankr. E.D.N.C. Jan. 4, 2012) (recognizing that DSOs "may not be discharged in Chapter 13" but that "other types of debts arising out of a separation or divorce, including property settlements, are dischargeable") (citation omitted); *In re Brucia*, 2011 WL 2600714, *2 (Bankr. D.N.J. June 29, 2011) ("[i]f a debtor completes a chapter 13 plan and receives a discharge under 11 U.S.C. § 1328(a), a spousal claim that is not a DSO is discharged.  11 U.S.C. § 1328(a)(2) does not incorporate subsection 523(a)(15).").

Here, the undersigned agrees with the Bankruptcy Court that the record evidence strongly favors a conclusion that Heard and Steele intended the Pension Settlement to constitute a property settlement, such that it was not in the nature of support, alimony or maintenance. The September 1994 Judgment approved the parties' "oral property settlement agreement," of which the pension payments were designated as a part. (Doc. 1, Exh. D, ¶ G.) That decree further approved the parties' stipulation that "[e]ach of the parties waives forever, any and all rights and claims for maintenance from the other." (*Id.*, ¶ G(11).) The Bankruptcy Court correctly noted that all language in the parties' agreement (as adopted in the September 1994 Judgment) points in the direction of their intent that the Pension Settlement was in the nature of a property settlement, not alimony, maintenance or support. Moreover, Illinois law is clear that "pension benefits earned during the marriage are considered marital property and, upon dissolution, are subject to division like any other property." *In re Marriage of Menken*, 778 N.E.2d 281, 283 (Ill.App. 2 Dist. 2002); *see also In re Marriage of Abma*, 720 N.E.2d 645, 653 (Ill.App. 1 Dist. 1999) (pension benefits "are treated as earnings, and to the extent that a spouse earned those benefits during the marriage, they are considered marital property. … Accordingly, they are subject to division upon dissolution, like any other marital property.").[10]

Under the circumstances, and upon *de novo* review, the Court **affirms** the Bankruptcy Court's determination that Heard's obligation to pay a portion of his pension benefits to Steele was not a domestic support obligation under § 523(a)(5), but was rather in the nature of a property settlement under § 523(a)(15), such that it is dischargeable in bankruptcy upon completion of his Chapter 13 plan.[11]

---

[10] As previously noted, federal (not state) law controls whether a given debt is in the nature of support or not. Nonetheless, federal courts may draw guidance from state law in performing this inquiry. *See Cummings*, 244 F.3d at 1265 ("Although federal law controls, state law does provide guidance in determining whether the obligation should be considered 'support' under § 523(a)(5).") (citation and internal quotation marks omitted). In any event, federal courts have found, as a general proposition, that "[t]he award of a portion of pension benefits may constitute a property settlement that will be discharged in bankruptcy." *In re Gendreau*, 122 F.3d 815, 818 (9th Cir. 1997); *see also In re McCafferty*, 96 F.3d 192, 195 (6th Cir. 1996) ("the state court clearly indicated that the pension distribution was not intended to be a spousal support award, so Ms. McCafferty was not entitled to prevail under 11 U.S.C. § 523(a)(5)").

[11] Steele's appellate briefs do not recite argument or authority that Heard's obligation to pay a portion of his pension benefits to Steele should be deemed a DSO in the (Continued)

### C.      Is the Pension Settlement Part of the Bankruptcy Estate?

The second issue the parties presented to the Bankruptcy Court – and the one that appears to animate this appeal – is whether the portion of the pension benefits that Heard agreed to pay Steele pursuant to the September 1994 Judgment is properly considered part of the bankruptcy estate, or whether such benefits are Steele's sole and exclusive property.  Stated differently, the question is whether the divorce decree conferred upon Steele a vested, exclusive property right to the Pension Settlement, such that those pension benefits no longer belong to Heard, are outside of Heard's bankruptcy estate, and are unavailable to fund Heard's Chapter 13 bankruptcy plan.[12] The Bankruptcy Court answered in the negative, reasoning that Paragraph G(9) of the September 1994 Judgment "is not self-executing. … In other words, it can't be her property, because … it says it had to come through Mr. Heard and it said if he didn't do what was required, she could garnish.  It clearly shows it's not self-executing and it was not in her hands."  (Doc. 2, at 119.)

### 1.      Section 541(a) and the Bankruptcy Estate.

By statute, the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).[13]  "The scope of §

---

nature of alimony, maintenance or support (rather than a property settlement) and therefore non-dischargeable in bankruptcy.  The Court thus lacks the benefit of any argument or explanation why Steele believes (if, indeed, she does) it was error for the Bankruptcy Court to characterize the Pension Settlement as a property settlement under § 523(a)(15) rather than a DSO under § 523(a)(5).  And Steele has failed to provide any law that might undermine the conclusion that obligations under § 523(a)(15) are dischargeable in the Chapter 13 context.

[12]      In various places in the record and briefs, this issue is alternatively framed as being whether the Pension Settlement is even a debt of Heard's.  This formulation merely restates the issue, which turns on whether the benefits are the sole property of Steele's.  If so, the theory goes, they are not Heard's "debt" (one cannot owe that to which one has already transferred all right, title and interest to the purported creditor) and are not part of his bankruptcy estate (because they are not his property at all).  For simplicity's sake, and to avoid redundancy, the Court addresses this argument as being whether the Pension Settlement is part of the bankruptcy estate, recognizing that the "debt" question is effectively the other side of the same coin.

[13]      As an initial matter, Steele contends that this action is governed not by § 541(a), but by § 541(d), which provides that "[p]roperty in which the debtor holds … only legal title and not an equitable interest … becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the (Continued)

541(a)(1) is broad, and includes property of all types, tangible and intangible, as well as causes of actions." *In re Meehan*, 102 F.3d 1209, 1210 (11th Cir. 1997); *see also Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) ("Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition."); *Carver v. Carver*, 954 F.2d 1573, 1577 (11th Cir. 1992) ("Property of the estate generally includes all the debtor's property as of the commencement of the bankruptcy case. … However, when a debtor files under Chapter 13, the bankruptcy estate includes property and wages gained after commencement of bankruptcy proceedings."). "[P]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *In re Witko*, 374 F.3d 1040, 1043 (11th Cir. 2004) (citations omitted); *see also Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) ("The extent and validity of the debtor's interest in property is a question of state law.").[14] Accordingly, Steele's and Heard's interests in the subject pension benefits are defined by Illinois state law.

---

debtor does not hold." 11 U.S.C. § 541(d). This argument misapplies subsection (d). After all, Steele's position is that because Heard had promised to pay the Pension Settlement to her, he lacks an equitable interest in those benefits. (Doc. 9, at 17.) Under this construction, any property that a debtor promised to turn over to any creditor at any time would not be property of the bankruptcy estate because the property "equitably belongs" to the creditor. Neither the text of the statute nor the interpretive case law warrants such a broad, sweeping interpretation of § 541(d), which would effectively reduce many bankruptcy estates to nil. A creditor who is owed property by a debtor would always have an argument that the property "equitably belongs" to it. Simply put, § 541(d) cannot logically mean what appellant says it means. Of course, if Illinois law treats pension settlements in divorce decrees differently than other kinds of property settlements by creating immediate, exclusive, vested rights in the non-debtor spouse, then Steele's § 541(d) argument might have more traction. It is to that issue that we now turn.

[14]     Where, as here, the issue is whether certain property is part of the bankruptcy estate, and the debtor has made an initial showing that the debtor has an ownership interest in the property, "the burden of proving that property is removed from the ambit of the estate under Section 541(d) is on the party claiming the equitable interest." *In re Arter & Hadden, L.L.P.*, 335 B.R. 666, 671 (Bankr. N.D. Ohio 2005) (*quoting In re Doug Baity Trucking, Inc.*, 2005 WL (Continued)

###### 2.    Illinois Law and Pension Settlements.

Steele's position is that the percentage of Heard's future pension benefits payable to her under the September 1994 Judgment became "her sole and separate property" that "vested upon entry of the judgment of divorce."  (Doc. 9, at 14.)  In the bankruptcy context, property interests are created and defined by state law; therefore, we look to Illinois law to determine what interest (if any) Steele had in the Pension Settlement.  Illinois case law leaves no doubt that pension benefits are marital property, and that a spouse who is married at a time when the other spouse accrues pension benefits becomes a co-owner of such benefits at the time of dissolution.[15] Although Steele relies heavily on this line of authorities, it stands for the unremarkable proposition that Heard's pension benefits were marital property that had to be addressed in a property settlement upon divorce, which they were.[16]  Moreover, these cases actually work against her position inasmuch as they confirm that (i) pension benefits are property, and (ii) upon divorce, such benefits are subject to division just like any other marital property.  Again, federal

_____

1288018, *2 (Bankr. M.D.N.C. 2005)); *see also DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006) (after debtor or trustee makes initial showing that estate has ownership interest in property, burden shifts to party claiming equitable interest under § 541(d)).

[15]    *See, e.g., In re Marriage of Richardson*, 884 N.E.2d 1246, 1255 (Ill.App. 1 Dist. 2008) ("At dissolution, respondent obtained an actual co-ownership interest in the benefits as marital property; she became a co-owner of the pension benefits accrued during the marriage."); *Abma*, 720 N.E.2d at 653 (pension benefits "are treated as earnings, and to the extent that a spouse earned those benefits during the marriage, they are considered marital property. … Accordingly, they are subject to division upon dissolution, like any other marital property."); *In re Marriage of Roehn*, 576 N.E.2d 560, 563 (Ill.App. 2 Dist. 1991) ("Insofar as petitioner's beneficial interest in the Fund was acquired during the marriage, respondent upon dissolution of the marriage became a co-owner of the pension benefits as marital property.") (citations omitted).

[16]    To say that Steele had a co-ownership interest in Heard's pension benefits at the time of divorce merely demonstrates the obvious point that such benefits were properly included in the parties' property settlement.  Had Steele lacked any interest in those benefits when the marriage dissolved, Heard would have had no reason to agree to include them in the property settlement because they would not have been marital property.  What matters is not the nature and extent of Steele's rights to the Pension Settlement upon filing for dissolution, but the nature and extent of her rights upon entry of the property settlement agreement and confirmation/adoption of same in the September 1994 Judgment.

bankruptcy law is clear that a debtor's obligations to make good to an ex-spouse on a marital property settlement are dischargeable in Chapter 13 proceedings (which necessarily implies that the underlying assets are part of the bankruptcy estate). So it is not enough for Steele to point to Illinois cases characterizing pension benefits as marital property.

A more interesting question is whether the property settlement manifested in the September 1994 Judgment vested in Steele full and exclusive rights in the Pension Settlement under Illinois law, thereby stripping Heard of his legal and/or equitable interest. If that happened, then the Pension Settlement could properly be deemed outside the broad scope of § 541(a)(1). Steele insists that the effect of the September 1994 Judgment was exactly that; however, the Bankruptcy Court found (and this Court agrees) that the language of that divorce decree imparts to Steele no vested right of ownership in the Pension Settlement. The decree indicated that the payments were for Heard's retirement or pension, that all pension benefits would be paid directly to Heard (not to Steele), that Heard was responsible for paying the Pension Settlement over to Steele, that "[t]his benefit shall be enforceable by garnishment of [Heard] by [Steele]," and that "[i]n the event municipal pensions become subject to a Qualified Domestic Relations Order ((QDRO), [Steele] shall have the right to make application directly to the proper pension board or boards." (Doc. 1, Exh. D, at ¶ G(9).) As the Bankruptcy Court observed, nothing in the text of that divorce decree specified that legal or equitable title in the Pension Settlement would immediately vest in Steele, that Steele would have exclusive ownership rights in the Pension Settlement, or that Heard was merely a trustee as to those payments; rather, the document provided that Heard would receive his pension benefits and cut a check to Steele for the Pension Settlement amount. If he did not do so, then Steele's only recourse for collecting payment was garnishment (*i.e.*, the agreement was not self-executing). By all appearances, the language of the decree did not vest in Steele immediate ownership or title to the Pension Settlement; rather, it imposed on Heard an obligation to pay his benefits to her in installments as part and parcel of the parties' property settlement (which, again, was dischargeable under bankruptcy law).[17] And the decree did not provide that Heard consented to

---

[17] The Bankruptcy Court's reasoning on this point is persuasive, to-wit: "I think the way the divorce decree reads that the pension plan remained property of Mr. Heard's estate. And I say that, because it actually says it's his pension, and he has the obligation to pay money over to her, and that she could get it by garnishment, if you will, which means to me that it isn't hers. (Continued)

entry of a QDRO (or any state-law analogue), only that Steele could apply for one from LABF if the law changed.

Steele urges the Court to find that Illinois law rendered the Pension Settlement her sole and exclusive property.  She argues that her interest in the Pension Settlement vested when the divorce proceeding commenced, and relies on an Illinois statute to support that contention.  The relevant subsection reads, "Each spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced ***and continues only during the pendency of the action***."  750 Ill. Comp. Stat. 5/503(e) (emphasis added).  Remarkably, Steele overlooks the highlighted text, instead incorrectly implying that § 5-503(e) vests her right of ownership in the Pension Settlement for all time.  By its terms, that section does not render Steele's rights in the Pension Settlement vested after the conclusion of the divorce proceedings, nor does it cause that Pension Settlement to become her sole and exclusive property.  It says only that there was common ownership in the pension benefits when the divorce proceedings were underway, without indicating what (if any) interest Steele had in those benefits after entry of the divorce decree and conclusion of the divorce proceedings.

In her principal brief, Steele leans heavily on *In re Brown*, 168 B.R. 331 (Bankr. N.D. Ill. 1994), for her interpretation of Illinois law.[18]  *Brown* lends superficial support to Steele's position, particularly in its blanket statement that Illinois law provides "that a former spouse's interest in a debtor's pension becomes the sole and separate property of the nondebtor spouse upon entry of a final judgment of divorce."  *Id.* at 334.  The trouble is that *Brown* does not identify a single Illinois authority that so held, but instead appears to take cues from what it calls the "majority view" of bankruptcy courts in other jurisdictions.  Because property rights are defined by state law, the relevant inquiry is not what the "majority view" is among federal bankruptcy courts, but what the "Illinois view" is.  For that question, *Brown* is neither controlling

_____

It isn't entitled to her, because it says he has it, he's to pay it over, and if he doesn't, she can garnish him.  I think that clearly means it's property of his estate."  (Doc. 2, at 117-18.)

[18]     Indeed, Steele openly acknowledges that *Brown* "is the leading case for our position."  (Doc. 9, at 29.)

nor instructive in defining the contours, features and boundaries of Illinois property rights in a pension settlement post-divorce decree.[19]

### 3.    The Illinois Constitution and QILDROs.

Again, the Pension Settlement constitutes a portion of pension benefits payable to Heard by the Laborers' Annuity & Benefit Fund that he earned during 31 years of employment with the City of Chicago.  The Illinois Constitution provides that "[m]embership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired."  Ill. Const. 1970, art. XIII, § 5.  That "enforceable contractual relationship" was between Heard and the LABF; therefore, the Illinois Constitution declares that benefits accruing to Heard via that relationship "shall not be diminished or impaired."  This anti-alienation provision casts considerable doubt on Steele's insistence that the Pension Settlement was "her sole and separate property" from the date of entry of the September 1994 Judgment.  Such an arrangement sounds strikingly like a diminution or impairment of the benefits guaranteed to Heard under the Illinois Constitution.

In an attempt to evade this unfavorable aspect of Illinois law, Steele invokes an Illinois statute providing that "[t]he recognition of pension benefits as marital property and the division of these benefits *pursuant to a Qualified Illinois Domestic Relations Order* shall not be deemed to be a diminishment, alienation, or impairment of those benefits."  750 Ill. Comp. Stat. 5/503(b)(2) (emphasis added).  What Steele wants in this adversary proceeding is not "recognition of pension benefits as marital property" (that has already been done, and everyone is in agreement that such benefits were indeed marital property until the time of the property settlement agreement), but rather the "division of these benefits" (*i.e.*, a determination that the Pension Settlement belongs to Steele and Steele alone, such that it is outside the bankruptcy estate).  The distinction is important.  Under § 503(b)(2), not every "division of these benefits" is

---

[19]    In her principal brief, Steele also cites *Cullen v. Cullen*, 2001 WL 883692 (N.D. Ill. Aug. 6, 2001), for the proposition that a spouse obtained "a vested interest in a portion of the debtor's Pension Fund and that interest vested upon entry of the dissolution of marriage."  (Doc. 9, at 25.)  However, the only Illinois authority on which *Cullen* relied for this point was *Brown*, which is unilluminating for the reasons identified *supra*.  It follows that *Cullen* is of limited utility in defining the parameters of Illinois law for the same reasons that *Brown* is.

exempted from the "diminished or impaired" restrictions of the Illinois Constitution; rather, only a "division of these benefits pursuant to a Qualified Illinois Domestic Relations Order" is safe from the constitutional proscription against impairing Heard's contractual relationship with LABF.  That is to say, unless there is a division of Heard's retirement benefits pursuant to a Qualified Illinois Domestic Relations Order, Steele's premise (*i.e.*, that the Pension Settlement is her separate property, no longer belongs to Heard, and is therefore outside Heard's bankruptcy estate) founders on the shoals of the anti-alienation provision for governmental pension benefits, as set forth in the Illinois Constitution.

As indicated previously, a Qualified Illinois Domestic Relations Order, or "QILDRO," is "a court order issued by an Illinois court that directs an Illinois public retirement system to pay an alternate payee, all or a portion of a member's retirement benefit ….  An alternate payee is typically a former spouse."  (Doc. 1, Exh. D-3, at 5.)  The Illinois statute that created QILDROs includes an important limitation in deference to the Illinois Constitution's anti-alienation provision.  Specifically, the statute reads as follows:  "In accordance with Article XIII, Section 5 of the Illinois Constitution, which prohibits the impairment or diminishment of benefits granted under this Code, a QILDRO … ***shall not be effective without the written consent of the member*** if the member began participating on or before" July 1, 1999.  40 Ill. Comp Stat. 5/1-119(m)(1) (emphasis added).  Illinois courts have upheld this consent requirement of § 1-119(m), recognizing that it "was included to protect a pensioner's rights under article XIII, section 5, of the Illinois Constitution," and have opined that "any attempt to diminish its effect should not be taken lightly."  *In re Marriage of Menken*, 778 N.E.2d 281, 284 (Ill.App. 2 Dist. 2002).  In *Menken*, the appellate court held that where (as here) the pensioner became a member of the pension/retirement system before July 1, 1999, "the trial court could not issue a QILDRO against respondent's pension benefits unless respondent consented to it.  Respondent did not want to sign a consent form, and … the trial court lacked the authority to order respondent to execute the consent."  778 N.E.2d at 284.

To be clear, QILDRO is relevant to this appeal because Steele claims the QILDRO mechanism caused the Pension Settlement to vest with her, such that the Pension Settlement was and is her sole, exclusive property, not part of the bankruptcy estate, and not a debt owed by Heard at all.  Viewed in that light, the availability of a QILDRO is critical to Steele's argument that Illinois law vested in her an immediate, exclusive right to the Pension Settlement.  As the

Court reads the parties' briefs, both sides concur that if a QILDRO had been issued as to the Pension Settlement, then Steele would indeed possess a vested right in those payments, which would belong solely and exclusively to her and would therefore lie beyond Heard's bankruptcy estate because Heard would no longer possess any interest in those monies. In that scenario, Steele would be entitled to proceed directly against the LABF, not Heard, to collect future payments in accordance with the Pension Settlement. *See generally In re Gendreau*, 122 F.3d 815, 819 (9th Cir. 1997) ("Colleen does not have a personal claim against William that could be discharged by his bankruptcy – her rights are against United.").

But Steele has not obtained a QILDRO. Without one, she cannot demand that LABF pay over future installments of the Pension Settlement directly to her. More importantly, Heard has unequivocally stated that he will not consent to the issuance of a QILDRO as to the Pension Settlement. *Menken* makes plain that Illinois courts cannot force Heard to sign a consent form against his wishes, because to do so would violate the anti-alienation language of the Illinois Constitution. Therefore, the existence of the QILDRO mechanism does not appear to support Steele's argument that the Pension Settlement is her sole, exclusive, vested property. Given the procedural steps that Steele would have to undertake to obtain a remedy, the considerable doubt that a QILDRO will be available to her at all, and the Illinois Constitution's prohibition on alienation of Heard's pension rights outside the QILDRO context, Steele's attempt to parlay the QILDRO procedure into a legal determination that the Pension Settlement became her sole, exclusive property in September 1994 (or at any other time prior to Heard filing his Chapter 13 petition) is not persuasive. So the Bankruptcy Court ruled during the August 9 hearing when she reasoned, "according to Illinois law, as I read it, it's not a QILDRO, and the biggest reason is because Mr. Heard would have to consent to it becoming a QILDRO due to the date he started service for the city, and he has not consented. So, it's not a QILDRO, which again goes to the fact that it is property of the estate." (Doc. 2, at 118.)[20]

---

[20]     There is an important clarification. In neither her arguments to the Bankruptcy Court nor her principal brief on appeal did Steele offer any Illinois authority that might counteract the debilitating effect of the *Menken* line of cases on her position. Again, *Menken* stresses that (i) the pensioner's consent to a QILDRO is mandatory where (as here) the pensioner became a member of the retirement plan before § 1-119(m)'s effective date; and (ii) Illinois courts lack authority to force a pensioner to sign a consent form. The Bankruptcy Court followed *Menken*. And Steele never supplied the Bankruptcy Court with any argument or legal (Continued)

### 4.   *Recap/Conclusion.*

In sum, the centerpiece of Steele's appeal is her contention that her property rights in the Pension Settlement vested with the September 1994 Judgment was entered, such that the Pension Settlement is her sole, separate property and outside Heard's bankruptcy estate.  For this argument to succeed, Steele must demonstrate that Illinois law would find her property right in

---

basis for circumventing or satisfying the consent rule recognized in *Menken*.  The same is true of Steele's principal brief on appeal.  In short, nothing that Steele provided the Bankruptcy Court or opposing counsel would suggest that her position was that a QILDRO may be entered against Heard even if he now withholds consent.  Yet Steele devoted five pages of her reply brief on appeal to a 2009 Illinois appellate decision, *Rafferty-Plunkett v. Plunkett*, 910 N.E.2d 670 (Ill.App. 3 Dist. 2009), wherein the court imputed consent to a QILDRO from a pensioner's execution of a dissolution agreement, even though he later declined to sign a QILDRO form.  *See id.* at 676 (where pensioner signed the dissolution agreement and consented to award spouse 50% of his pension benefits, that agreement "meets the requirement of the written consent called for in the Pension Code" and "can be read together with the QILDRO forms").  This reply brief marked the first time in this matter that Steele cited *Rafferty-Plunkett* or argued that Heard need not execute a consent form now for a QILDRO to take effect.

Case law is legion for the proposition that it is generally improper for a litigant (i) to present a new, previously available argument for the first time on appeal, and (ii) to present a new, previously available argument for the first time in a reply brief.  *See, e.g., Cummings*, 244 F.3d at 1267 n.2 ("This court may decline to consider issues raised for the first time in a reply brief."); *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360 (11th Cir. 1984) ("an appellate court generally will not consider a legal issue or theory unless it was presented to the trial court"); *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 90 n.13 (2nd Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); *In re Texas Pig Stands, Inc.*, 610 F.3d 937, 945 (5th Cir. 2010) (issues raised by bankruptcy appellant for first time on appeal will not be considered by appellate court); *In re Mortgages Ltd.*, 427 B.R. 780, 786 (D. Ariz. 2010) ("Appellants raise this argument for the first time in their reply brief, therefore depriving Appellees of an opportunity to respond.  Because Appellants failed to include this argument in their opening brief, this issue is waived."); *United States v. Menotte*, --- B.R. ---, 2012 WL 5868578, *1 n.4 (S.D. Fla. Nov. 19, 2012) ("It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned.") (citations omitted).  Steele did both; therefore, the Court will not consider her improper *Rafferty-Plunkett* argument.  To do otherwise would be to evaluate the Bankruptcy Court's ruling based on an argument that appellant never presented to that tribunal, and to which appellee never had an opportunity to respond, either in this Court or in the Bankruptcy Court, at an unacceptable cost in terms of fairness and efficiency.  Besides, the text of the dissolution order in *Rafferty-Plunkett* appears distinguishable from that in this case, for purposes of imputing written consent to the payment of pension benefits from a pension system to an alternate payee such as an ex-spouse.  And LABF rules require that its consent forms be used, so there is some question as to whether *Rafferty-Plunkett* would override LABF rules even if it did apply.

the Pension Benefit to be vested, sole and separate.  She has not done so.[21]  The *Brown* case
which she characterizes as "the leading case for [her] position" cites no Illinois authority
embracing that legal principle.  The Illinois Constitution has an anti-alienation provision that
generally forbids diminution or impairment of a public employee's contractual relationship with
a pension plan.  While the Illinois legislature has created an exception to that anti-alienation
provision that allows pension benefit division pursuant to a QILDRO, Heard's refusal to execute
a consent form renders the availability of a QILDRO highly problematic here, particularly with
Steele identifying no authority to the Bankruptcy Court or in her principal brief on appeal that
might support a conclusion that the consent requirement is satisfied.  Although Steele champions
a "majority rule" from other jurisdictions, she does not offer any legal support to advance the
notion that either Illinois has adopted the majority rule, or that the majority rule is any more
persuasive than the "minority rule."

With regard to Illinois law (which defines Steele's property rights), the materials before
the Court confirm that (i) the Illinois Constitution imposes a broad restriction on impairment of a
public employee's contractual rights to receive pension benefits from a public retirement system;
and (ii) the QILDRO exception is narrow, and requires consent of the debtor for a division of
pension benefits to be permissible.  Moreover, these features of Illinois law must be considered
in the context of the September 1994 Judgment.  That dissolution order neither declares nor
decrees Steele to have vested rights in the Pension Settlement and fails to create any self-
executing means for Steele to collect the Pension Settlement.  Instead, it provides that the
pension benefits are Heard's, that he is to pay the Pension Settlement to Steele in installments
out of those benefits once he receives them, and that she can enforce the September 1994
Judgment by garnishment.

---

[21]  Indeed, she does not even explain how Heard's right to pension benefits had
vested as of the September 1994 Judgment.  *See generally Richardson*, 884 N.E.2d at 1253
(noting that a public employee's interest in pension plan may not have vested or matured at the
time of marital dissolution, that benefits could cease to exist altogether, and that valuation of
such benefits was therefore impossible).  If Heard's right to the pension benefits was unvested as
of the September 1994 Judgment, then it would appear problematic for Steele to argue that her
right and entitlement to the Pension Settlement was vested at that time, and that the Pension
Settlement was her sole and exclusive property from that moment forward.

Upon examination of all of the above, the Court concludes that the Bankruptcy Court was correct in ruling that the Pension Settlement is not the property of Steele, but remained the property of Heard, and that it is therefore part of Heard's bankruptcy estate. Nothing that Steele has presented concerning Illinois law or the text of the dissolution order warrants a contrary conclusion.[22]

### D.   Constructive Trust.

Next, Steele seeks reversal of the Bankruptcy Court's assessment that Heard is not holding the Pension Settlement in constructive trust for Steele's benefit. In the August 9 hearing, the Bankruptcy Court opined, "I do not think there is a constructive trust here. I don't see any language that says anything about a trust. In fact, that's what in essence the QILDRO and QDRO are to protect against." (Doc. 2, at 119.) On appeal, Steele maintains that this ruling was error and points to authorities from jurisdictions other than Illinois that she says lend support to her position that a constructive trust was created.

There are a multitude of problems with Steele's argument. First, as the Bankruptcy Court correctly observed, nothing in the September 1994 Judgment suggested that the state court

---

[22]        At the risk of gilding the lily, the Court returns to the fundamental principle under Illinois law that pension benefits "are subject to division upon dissolution, *like any other marital property*." *In re Marriage of Abma*, 720 N.E.2d 645, 654 (Ill.App. 1 Dist 199) (emphasis added). *Abma* means that, in general, Illinois law does not consider the division of pension benefits in a marital dissolution to be different than division of other marital property. Federal bankruptcy law is clear that property settlements owed to an ex-spouse are dischargeable debts of the bankruptcy estate in the Chapter 13 context. And Illinois law says that pension benefits are divided just like any other marital property. A thought experiment highlights the ramifications of these principles. Suppose that under a hypothetical dissolution order, the debtor agreed to a property settlement in which her ex-spouse would receive the following marital property: a fine art painting stored in the debtor's home, $10,000 from a savings account in the debtor's name, and a certain percentage of the debtor's future governmental pension benefits. Suppose also that the debtor filed a Chapter 13 bankruptcy petition before transferring any of these assets to the ex-spouse. If the painting and the cash are assets of the bankruptcy estate (and Steele identifies no reason why they would not be), then the percentage of pension benefits (which Illinois law treats like any other marital property for property settlement purposes) must be an asset of the bankruptcy estate, as well. By contrast, if none of these assets were considered part of the bankruptcy estate (because the non-debtor spouse had an interest in them), then the effect would be to subvert the Bankruptcy Code provisions that make property settlements dischargeable under Chapter 13. Thus, Steele is advocating a result that not only lacks support in Illinois law, but that would also conflict with federal bankruptcy law by effectively exempting an entire class of dischargeable debts from the bankruptcy estate in the first place.

intended to create any sort of constructive trust in which Heard would hold the Pension Settlement as trustee for Steele's benefit.  Second, appellant's own authorities emphasize that the determination of whether a constructive trust is created by a state-court divorce order is a question of state law.  *See In re McCafferty*, 96 F.3d 192, 196-97 (6th Cir. 1996).  Third, Steele has not identified any strand of Illinois law that would recognize a constructive trust in these circumstances.  Fourth, the Illinois Constitution anti-alienation provision discussed *supra* would appear to weigh heavily against this kind of "constructive trust" argument, and § 1-119(m) would appear to prevent persons in Steele's position from relying on a constructive trust theory as an end-run around an unavailable QILDRO remedy.  *Cf. Metropolitan Life Ins. Co. v. Cline*, 2010 WL 2835723, *2 (9th Cir. July 20, 2010) ("While certain circumstances allow for the imposition of a constructive trust over the proceeds from a pension plan, … [t]he imposition of a constructive trust simply cannot be used to circumvent ERISA preemption except in the limited circumstances where a valid QDRO exists.").  Fifth, as Heard correctly points out, the applicable limitations period for Steele to seek imposition of a constructive trust under Illinois law has expired.[23]

For all of these reasons, the Court finds Steele's constructive trust argument to be without merit, and will affirm the Bankruptcy Court's determination that Heard did not hold the Pension Settlement in constructive trust for Steele.

### E.    *Automatic Stay.*

Included in Steele's statement of issues are various questions about the automatic stay.  Specifically, Steele asks this Court to decide on appeal whether the automatic stay in bankruptcy applies to her efforts to obtain a QILDRO in Illinois state court and, if so, whether that automatic stay should be lifted to allow her to seek that QILDRO.  (Doc. 1, at 5, 27-28.)  Review of the

---

[23]    Illinois law establishes a five-year limitations period for actions seeking imposition of constructive trust.  *See, e.g., Hagney v. Lopeman*, 590 N.E.2d 466, 468 (Ill. 1992) ("In Illinois, a five-year statute of limitations applies to an action for constructive trusts."); *Schreiner v. City of Chicago*, 92 N.E.2d 133, 141 (Ill. 1950) ("the most that could be charged against the city was that it became a constructive trustee, and constructive trusts are subject to limitation or laches after the lapse of five years without action").  The record reflects that Heard began receiving LABF benefits on July 1, 2006.  (Doc. 1, Exh. G, at 2.)  Appellant identifies no circumstances that would warrant tolling that limitations period here, yet her adversary proceeding initiated in July 2012 falls well outside the applicable five-year period.

record does not reveal that the Bankruptcy Court made any written or oral rulings specifically addressing the automatic stay, or whether Steele may proceed in state court to seek a QILDRO. Appellate courts generally do not decide issues upon which the court below did not rule.  *See, e.g., Greystone Const., Inc. v. National Fire & Marine Ins. Co.*, 661 F.3d 1272 (10th Cir. 2011) ("The better practice on issues raised below but not ruled on by the district court is to leave the matter to the district court in the first instance.") (citation and internal marks omitted).  To the extent that appellant's concerns regarding the automatic stay have not been rendered moot by the Bankruptcy Court's August 9 rulings that have been affirmed on appeal, appellant must present these issues to and obtain a ruling from the Bankruptcy Court in the first instance.

**III.   Conclusion.**

Upon careful review of appellant's numerous asserted grounds for appeal, the Court finds no clear error in the Bankruptcy Court's findings of fact and no error in its conclusions of law. Accordingly, the Bankruptcy Court's ruling that the pension benefits owed by Heard to Steele are a debt dischargeable in bankruptcy upon completion of the Chapter 13 plan and are part of the bankruptcy estate are due to be, and the same hereby are, **AFFIRMED**.


DONE and ORDERED this 4th day of February, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE